* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the opinion of award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Houser, with modifications.
 * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement (admitted into the record and marked as Stipulated Exhibit 1) as:
 STIPULATIONS
1. On December 9, 2003, plaintiff sustained an admittedly compensable injury by accident giving rise hereto, wherein plaintiff was transferring a patient from his bed to a chair and their shoes got tangled causing plaintiff to fall sustaining injuries to her neck, left shoulder, left foot and hip and low back.
2. On December 9, 2003, an employee-employer relationship existed between plaintiff-employee and defendant-employer with the employer being insured by The PMA Insurance Group (hereinafter, "PMA"). The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. By an Industrial Commission Form 60 filed February 3, 2004, defendant-employer and defendant-carrier PMA acknowledged plaintiff's average weekly wage of $381.75, yielding a compensation rate of $254.52.
4. On May 14, 2004, plaintiff was released to return to work with light duty restrictions of lifting no more than twenty (20) pounds, limited bending, stooping, and twisting, and being able to sit as necessary. Plaintiff thereafter returned to work for defendant-employer.
5. On June 7, 2004, the date of the alleged second injury by accident giving rise hereto, plaintiff was pushing an ice cart, passing out ice and water, when she alleges she felt a sudden, severe onset of pain in her low back, left hip, and leg causing her to fall forward on her knees, sustaining bilateral injuries to her knees and injuries to her left elbow and shoulder and re-injuring her neck, back and hip.
6. On June 7, 2004, an employee-employer relationship existed between plaintiff-employee and defendant-employer with the employer being insured by defendant-carrier The Phoenix Insurance Company/The Travelers (hereinafter, "Phoenix"). The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
7. At the hearing before the Deputy Commissioner, the parties submitted the following:
 a. A Packet of Medical Records, which was admitted into the record and marked as Stipulated Exhibit 2;
 b. A Packet of Various Documents including Accident Reports, Industrial Commission Forms, Witness Statements, and Discovery Responses, which was admitted into the record and marked as Stipulated Exhibit 3; and,
 c. A Transcript of Plaintiff's Recorded Statement, which was admitted into the record and marked as Stipulated Exhibit 4.
8. The issues for determination are as follows:
 a. Whether plaintiff is entitled to additional benefits as a result of her previously accepted back injury of December 9, 2003;
 b. Whether on June 7, 2004, plaintiff sustained a compensable injury by accident to her left and right knees, left elbow, and left shoulder and re-injured her neck, back, and hip as a result of her employment with defendant-employer and, if so, the compensable consequences thereof; and,
 c. Whether plaintiff is entitled to attorney fees pursuant to N.C. Gen. Stat. § 97-88.1 as a result of defendants' unjustifiable denial of plaintiff's June 7, 2004, injury.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and upon all of the confident evidence of record, including reasonable inferences flowing therefrom, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 56 years old. She was born March 1, 1949. Plaintiff completed the eighth grade and obtained her Certified Nursing Assistant (CNA) certification from AB Technical College in 1992.
2. Prior to beginning her employment with defendant-employer in 1994, plaintiff experienced pain in her right knee as a result of a work-related incident with a previous employer, The Brian Center. Since at least 1994, plaintiff's primary care physician has been Dr. Gretchen Hermanny. On August 17, 1994, Dr. Hermanny examined plaintiff for problems with her right knee. Thereafter, plaintiff has continued to seek treatment from Dr. Hermanny for various ailments including high blood pressure. Pertinent to this case is an examination on May 23, 2003, at which time plaintiff reported pain in her legs and knees, and her knees were noted to "crunch." On November 17, 2003, plaintiff retuned to Dr. Hermanny for lower left leg pain and left knee pain.
3. After beginning her employment with defendant-employer in 1994, plaintiff worked as a certified nursing assistant until sometime in 2002, when she stopped working in order to provide care for her ailing mother. After completing care for her mother, plaintiff returned to work for defendant-employer in February 2003.
4. Plaintiff's December 9, 2003, injury occurred as she was transferring a resident from a bed to a chair when her shoelaces became tangled with the Velcro on the patient's shoes, causing plaintiff to lose her balance and fall to the floor with the patient landing on top of her. As a result of this incident, plaintiff sustained a contusion to her head and injuries to her left neck, left shoulder, left arm, left back, left leg, and left foot.
5. Following this admittedly compensable injury by accident, plaintiff was initially treated at Translyvania Community Hospital where x-rays were performed that revealed osteoarthritis but no fractures. Plaintiff was diagnosed as having a contusion of the left hip, knee, and ankle and discharged with prescription pain medication. Additionally, plaintiff was advised to remain out of work.
6. On December 12, 2003, plaintiff was examined by Dr. M. Shane Foster. On that date, plaintiff reported experiencing pain in her back, in the back of her left shoulder, in her left hip, and at the top of her left foot. Following an examination, Dr. Foster indicated that plaintiff could return to work in three days with restrictions of lifting no more than 20 pounds and the avoidance of prolonged standing or lifting. Plaintiff returned to Dr. Foster on December 16, 2003, and reported no improvement with continued pain over the top of her left foot, in her left calf, and in her left lower back. Dr. Foster opined that plaintiff might have sustained a herniated disc. Dr. Foster recommended physical therapy and again released plaintiff to return to work with restrictions of lifting no more than 25 pounds and no frequent bending or stooping, along with no prolonged standing or walking
7. Thereafter, plaintiff began physical therapy at Brevard Physical Therapy Clinic. During her course of physical therapy, as documented by Dr. Foster's medical notes, plaintiff's symptoms remained the same with continued neck pain, low back pain, muscle spasms, and occasional dizziness.
8. Despite her physical therapy and adherence to Dr. Foster's restrictions, plaintiff's condition did not improve. Dr. Foster then referred plaintiff to Dr. Edward Lilly, an orthopaedic surgeon, and medically excused her from work as of December 31, 2003. On January 13, 2004, Dr. Foster noted that plaintiff was continuing to experience pain on the left side of her neck up into her head and in her lower back.
9. Plaintiff was initially examined by Dr. Lilly on January 29, 2004, at which time he also reviewed her history, and noted that plaintiff's pain began in her neck and extended down the posterior aspect of her left arm and to her elbow and, occasionally, into her hands. Dr. Lilly diagnosed plaintiff as having cervical and lumbar degenerative disc disease that was aggravated by her fall on December 9, 2003, and osteoarthritis of the left knee. Additionally, Dr. Lilly ordered an MRI of plaintiff's neck and lumbar spine, the results of which revealed spinal stenosis and degenerative disc problems at L4-5 and a grade 1 vertibral subluxation at L5-S1. Based upon these results, on March 25, 2004, Dr. Lilly medically excused plaintiff from work indefinitely, and provided her with an out-of-work note for defendant-employer.
10. Plaintiff returned to Dr. Lilly on April 1, 2004, and reported pain in her left lower extremity. Dr. Lilly noted that plaintiff had attempted to return to work at 6 hours per day, but that she continued to experience pain in her left buttock, knee, and ankle. Based upon his evaluation, Dr. Lilly opined that plaintiff would likely require a left knee arthroplasty procedure at some time in the future. Also on April 1, 2004, Dr. Lilly recommended a second MRI due to the fact that plaintiff had continued to experience pain four months subsequent to her December 9, 2003, injury. An MRI was then performed on April 19, 2004, and its results revealed Achilles and peroneus brevis tendonopathy.
11. On May 3, 2004, plaintiff again returned to Dr. Lilly and reported experiencing pain in the left side of her neck, shoulder, arm, buttocks, leg, and heel. Despite these symptoms, Dr. Lilly noted that plaintiff expressed the desire to return to work. Based on his examination, Dr. Lilly opined that plaintiff had a muscular-skeletal condition that was chronic in nature and numbness related to a specific trauma. Dr. Lilly also referred plaintiff to a spine surgeon and released her to return to work with limitations of standing and walking for one to three hours per day and sitting for one to three hours per day.
12. On May 14, 2004, Dr. Michael Goebel performed a spinal evaluation of plaintiff as recommended by Dr. Lilly. Dr. Goebel noted plaintiff's reports of left side, radiating body pain and the December 9, 2003, admittedly compensable injury. Dr. Goebel's examination revealed that plaintiff had a limited range of motion in her neck and low back, diminished strength in her left upper and lower extremities, and a decreased sensation to the touch within the dorsum and lateral aspects of her left foot. Additionally, Dr. Goebel specifically noted that the strength on plaintiff's right side was undiminished. Based upon his examination, Dr. Goebel diagnosed plaintiff as having myofascial pain syndrome, cervical degenerative disc disease without neurologic impingement, mild L4-S1 spinal stenosis, and L5 spondylolys. Dr. Goebel ordered an L5 epidural injection, prescribed medications, and released plaintiff to return to light-duty work with restrictions of lifting no more than 20 pounds, limiting bending, stooping and twisting, and with the provision that she be allowed to sit or stand as needed.
13. Pursuant to Dr. Goebel's direction, plaintiff returned to work on May 18, 2004, performing light-duty work that was made available by defendant-employer. Nonetheless, plaintiff continued to experience pain in her left lower back, hip, leg, and foot. At the hearing before the Deputy Commissioner, plaintiff testified that these symptoms continued from the date of her admittedly compensable injury on December 9, 2003, and had never substantially improved or resolved. Additionally during this period, plaintiff reported episodes in which she experienced a catch in her left hip and leg.
14. Due to these symptoms, plaintiff returned to Dr. Hermanny on May 20, 2004, at which time she reported experiencing significant pain in her back and hips, with the left hip being worse than the right, and radiating pain from the left hip around to her groin area. Following an examination, Dr. Hermanny noted that plaintiff had decreased sensation in her left leg below the knee, as well as in her left foot, left ankle, and hip. Based on her examination, Dr. Hermanny diagnosed plaintiff as having a chronic pain syndrome.
15. On June 7, 2004, plaintiff reported to work for defendant-employer at approximately 2:30 p.m. and was assigned the job of handing out ice and water. This required her to utilize a cart on which was placed pitchers of water, ice, and cups for her to distribute to the patients. At approximately 4:20 pm, plaintiff testified that she was holding two pitchers of water and was preparing to put ice in them when she experienced the sudden onset of pain, which she described as a cramp, in her left lower back, hip, and leg. Plaintiff was holding the two pitchers with one hand, so upon the onset of her cramp, she grabbed the cart, but it rolled causing her to fall onto both knees. When the ice cart rolled forward, plaintiff described her body as stretching forward then falling flat out on the floor.
16. Following the incident, Ms. Jennifer McDevitt, RN, a co-worker, Ms. Donna Buchanan, and the Director of Nursing came to plaintiff's aid. Ms. Buchanan testified that when she arrived at the site of the incident, plaintiff informed Ms. Buchanan that her left knee had given way. Ms. Buchanan further testified that prior to June 7, 2004, she had never observed plaintiff experiencing instability or knee pain. Additionally, Ms. Buchanan testified that she did not recall plaintiff reporting a sudden onset of pain, but that if such a fact had been reported, she would have included it in her written statement. Ms. Buchanan's written statement corresponds with her testimony and indicates that plaintiff reported that she fell due to her knee giving way. Nurse McDevitt's written statement also notes plaintiff's report of having fallen after her knee gave way. Additionally, defendant-employer's accident report indicates that plaintiff reported having fallen after her knee gave way.
17. Following this incident, plaintiff was examined at Transylvania Community Hospital where she reported having fallen after her left leg, and not her knee, gave way. Back x-rays revealed spondylolisthesis at L5-S1 and degenerative disc disease at L4-5 and L5-S1, and an x-ray of the left knee revealed osteoarthritis. Medical personnel at Transylvania Community Hospital diagnosed plaintiff as having sustained a contusion to her left knee.
18. On June 8, 2004, plaintiff was examined by Dr. Lilly and reported having again fallen at work. Dr. Lilly reviewed her x-rays and noted no fractures, but did note arthritis of the left knee. Dr. Lilly diagnosed plaintiff as having osteoarthritis and degeneration of the left knee, the condition for which he head earlier discussed the possibility of a knee arthroplasty. Additionally, Dr. Lilly recommended that plaintiff remain out of work until seen by a neurologist.
19. Also on June 8, 2004, defendant-carrier PMA submitted a questionnaire to Dr. Goebel noting that plaintiff had been under his care as a direct result of the December 9, 2003, injury from which she sustained a low back injury. Defendant-carrier PMA specifically inquired as to whether plaintiff had reached maximum medical improvement and whether she had sustained any permanent partial disability. Dr. Goebel completed this form on June 10, 2004, indicating that plaintiff was not at maximum medical improvement, but that she was anticipated to be reaching that point within 4-6 weeks.
20. Defendant-carrier PMA also submitted a questionnaire to Dr. Lilly inquiring as to whether plaintiff's current conditions were related to her December 9, 2003, injury by accident. Additionally, defendant-carrier PMA inquired as to the current treatment plan for that admittedly compensable injury, whether plaintiff had reached maximum medical improvement, and whether plaintiff had sustained any permanent partial disability. By correspondence dated July 14, 2004, Dr. Lilly responded, indicating that plaintiff had been his patient since January 29, 2004, and that he had provided treatment for her back, head, neck, lumbar spine, left leg, and left foot pain following a work-related injury on December 9, 2003. Dr. Lilly opined that plaintiff was at maximum medical improvement with a ten percent (10%) permanent partial disability rating to her back. Additionally, Dr. Lilly noted that plaintiff was unable to return to her job as a CNA, and recommended that she apply for Social Security Disability benefits due to her December 9, 2003, injury by accident. As of the hearing before the Deputy Commissioner date, plaintiff had applied for Social Security Disability benefits, but no benefits had been awarded.
21. In this matter, the determination of which carrier, if either, is liable for further benefits rests largely on the differentiation between a knee and a leg. Within the record of evidence, there are multiple references to plaintiff's left knee giving way as the cause of her fall on June 7, 2004, and also multiple references to her left leg giving way as being the cause. At the hearing before the Deputy Commissioner, plaintiff testified that she considered her knee to be the front side of her knee with the corresponding posterior side being part of her leg. Despite the possible confusing nature of this testimony and the varied reports of the cause of her fall on June 7, 2004, the Full Commission finds that making the ultimate causation determination is straightforward. In fact, the credible evidence of record establishes that plaintiff did not sustain any new injury by accident on June 7, 2004, but rather fell solely due to her continuing pain and other symptoms that originated on December 9, 2003.
22. Defendant-carrier PMA has attempted to convince the Full Commission that plaintiff only had complaints of left knee pain immediately after her admitted injury of December 9, 2003, but that "this is the only time prior to June 7, 2004, where the medical records indicate plaintiff complained of left knee pain." Defendant-carrier PMA attempts to use this as the premise for its argument that defendant-carrier PMA was not liable for plaintiff's injury and disability resulting from her June 7, 2004, incident when her left knee "gave way" causing her to fall.
23. Defendant-carrier PMA's argument described in Paragraph 22 above is flawed and contrary to the medical records which defendant-carrier PMA stipulated into evidence. Defendant-carrier PMA authorized plaintiff to be evaluated by Dr. Edward Lilly of Blue Ridge Bone and Joint of Asheville on January 29, 2004. After noting her fall of December 9, 2003, Dr. Lilly reported: "Since that time she also complained of pain in her left arm and shoulder as well as her left knee and leg."
24. Plaintiff thereafter returned to Dr. Lilly on April 1, 2004, complaining of left lower extremity pain. Dr. Lilly noted plaintiff had returned to work and was performing six hours of work per day, but continued to have difficulties with pain in her left buttock, knee, and ankle. On examination, Dr. Lilly noted significant findings of "medial joint line pain around the left knee" and, contrary to defendant-carrier PMA's assertion of no left knee complaints, actually offered to inject plaintiff's left knee, but plaintiff declined. Based on his evaluation, Dr. Lilly reported plaintiff would likely require an arthroplasty of the left knee in the future. Based on plaintiff's continued complaints of pain in her left ankle, Dr. Lilly felt an MRI scan was necessary as plaintiff was still symptomatic four months post-injury. An MRI scan was performed on April 19, 2004, disclosing Achilles and peroneus brevis tendonopathy.
25. Again on May 3, 2004, a little more than a month prior to her second injury, plaintiff returned to see Dr. Lilly complaining of pain in the left side of her neck, shoulder, arm, buttocks, leg, and heel. Dr. Lilly reported that plaintiff would like to return to work. Based on his examination, Dr. Lilly felt plaintiff suffered from muscular-skeletal complaints that were chronic in nature, but that her "numbness related to a particular trauma." Based on her continued complaints, Dr. Lilly released her to return to work with limitations of standing/walking for one to three hours per day and sitting for one to three hours per day.
26. Thereafter, plaintiff returned to see her family physician, Dr. Gretchen Hermanny, on May 20, 2004, complaining that her "back and hips hurt her really bad, especially the left hip — feels like a catch in it. Pain radiates from left hip around to groin area." Upon examination, Dr. Hermanny specifically noted "decreased sensation over medial leg below [left] knee, and over foot in part of deep peroneal nerve; decreased sensation over? superficial peroneal nerve over ankle; decreased sensation over lateral hip area on left." Based on her examination, Dr. Hermanny diagnosed plaintiff with chronic pain syndrome.
27. Accordingly, contrary to defendant-carrier PMA's assertion of limited complaints of left knee pain, the stipulated medical records clearly show that plaintiff consistently complained of left knee and leg pain up to the last medical visit prior to the June 7, 2004 incident. In fact, Dr. Hermanny's examination of May 20, 2004, shows that not only did plaintiff complain of left leg pain but that she actually had physical findings consistent with decreased sensation "over the medial leg below the knee."
28. While defendant-carrier PMA attempted to argue that some of the complaints by plaintiff were of pain in her left leg, as opposed to her knee, plaintiff's undisputed testimony was that she considered any pain directly behind her left knee to be "leg pain." Plaintiff considered her knee to be the front side of her knee with the corresponding posterior side being part of the leg. Despite the confusing nature of testimony and the varied reports of the cause of her fall of June 7, 2004, making the ultimate causation determination is straightforward. The credible evidence of record establishes that plaintiff did not sustain any new injury by accident on June 7, 2004, but rather fell solely due to her continuing pain and other symptoms which originated on December 9, 2003. Such finding is more than supported not only by the stipulated medical records discussed herein above but also the undisputed testimony of plaintiff, her immediate written statement to her employer, and the reports of her co-workers McDevitt and Buchanan.
29. Furthermore, after her fall on June 7, 2004, Defendant-PMA specifically wrote to Dr. Lilly, plaintiff's authorized treating physician, on July 8, 2004, and inquired as to her disability caused by her December 9, 2004, admittedly compensable injury. Dr. Lilly unequivocally responded that plaintiff continued to suffer from her left knee and moderate degenerative changes in her cervical and lumbar spine. He stated she had reached maximum medical improvement following her cervical and lumbar sprain and was deserving of a ten percent (10%) permanent partial impairment rating to her neck and back. However, as to her work capacity due to the December 9, 2003, injury Dr. Lilly clearly stated:
 I did not feel that she was able to return to her previous work as a nurse's aide. She has tried this before and wound up reinjuring herself and had too much pain to work. For this reason, I have recommended that she seek Social Security disability.
Accordingly, defendant-carrier PMA's own authorized treating physician, after specific questioning, reported to them that plaintiff was unable to perform her previous work duties due to her admittedly compensable December 9, 2003, injury, and further reported she should "seek Social Security Disability." In spite of this clear response that their admitted injury continued to cause plaintiff's disability, defendant-carrier PMA continued to deny liability for plaintiff's injuries and disability.
30. Plaintiff's December 9, 2003, admittedly compensable injury by accident resulted in plaintiff experiencing ongoing pain, weakness, and numbness in her left lower back, hip, knee, and leg, as well as left leg, knee, and foot weakness. As the direct and natural result of, and causally related to, her December 9, 2003, injury by accident and related symptoms, plaintiff fell at work on June 7, 2004, resulting in further injury to her lower back and her left and right knees.
31. As the result of her December 9, 2003, injury by accident, related symptoms, and her related workplace fall of June 7, 2004, plaintiff has been unable to earn any wages in her former position with defendant-employer or in any other employment for the period of June 8, 2004, through the present and continuing.
32. Based upon the totality of the evidence of record, defendant-carrier PMA's defense of this matter was not unreasonable or indicative of stubborn unfounded litigiousness.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. In Home v. Universal Leaf Tobacco Processors,119 N.C. App. 682, 459 S.E.2d 797, disc. review denied, 342 N.C. 192,463 S.E.2d 237 (1995), the North Carolina Court of Appeals noted that
 [t]he aggravation of an injury is compensable if the primary injury arose out of and in the course of employment, and the subsequent aggravation of that injury is a natural consequence that flows from the primary injury. Unless the subsequent aggravation is the result of an independent intervening cause attributable to [a] claimant's own intentional conduct, the subsequent aggravation of the primary injury is also compensable.
Id. at 685, 459 S.E.2d at 799 (citations omitted). According to the Court,
 An "intervening cause" in the context of the Workers' Compensation Act . . . is an occurrence "entirely independent of a prior cause. When a first cause produces a second cause that produces a result, the first cause is a cause of that result."
Id. (quoting Heatherly v. Montgomery Components, Inc.,71 N.C. App. 377, 323 S.E.2d 29 (1984).) In the instant case, plaintiff's medical records and testimony demonstrate that plaintiff never fully recovered from her December 9, 2003, admittedly compensable work-related injury. At the hearing before the Deputy Commissioner, plaintiff testified that the June 7, 2004, fall occurred when her "hip and leg just went out from pain" in her low back and hip. Plaintiff noted that the pain which caused her June 7, 2004, fall was not new pain, and that she "had been having the same pain" since her December 9, 2003, accident. Specifically, plaintiff testified that prior to June 7, 2004, she had experienced pain in her low back and behind her knee from her calf to her hamstring. She further testified that, in her mind, the area of her body behind her knee from her calf to her hamstring was part of her leg and not her knee. According to plaintiff, the front area of her knee was part of her knee while the posterior side of her knee was part of her leg. Although plaintiff testified the had never felt pain in her left knee prior to June 7, 2004, on cross-examination, she admitted the had been diagnosed with osteoarthritis in her left knee following the December 9, 2003, fall but prior to the June 7, 2004, fall.
2. On December 9, 2003, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer resulting in her experiencing ongoing left neck, shoulder, low back, hip, leg, and foot pain as well as left leg, knee, and foot weakness. N.C. Gen. Stat. § 97-2(6).
3. As the direct and natural result of, and causally related to her December 9, 2003, injury by accident and related symptoms, plaintiff fell at work on June 7, 2004, resulting in further injury to her lower back and her left and right knees. Id.
4. As the result of her December 9, 2003, injury by accident, her related symptoms, and her related workplace fall of June 7, 2004, plaintiff is entitled to have defendant-carrier PMA pay her ongoing total disability compensation at the rate of $254.52 per week for the period of June 8, 2004, through the present and continuing until such time as she returns to work, or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
5. As the result of her December 9, 2003, injury by accident, related symptoms, and her related workplace fall of June 7, 2004, plaintiff is entitled to have defendant-carrier PMA pay for all related medical expenses incurred or to be incurred, including expenses associated with treatment provided by Dr. Lilly, Dr. Goebel, and Dr. Hermanny subsequent to June 7, 2004. N.C. Gen. Stat. §§ 97-25; 97-25.1.
6. Because defendant-carrier PMA's defense of this matter was not unreasonable or indicative of stubborn unfounded litigiousness, plaintiff is not entitled to the award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing Findings of Facts and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendant-carrier PMA shall pay to plaintiff ongoing total disability compensation at the rate of $254.52 per week for the period of June 8, 2004, through the present and continuing until such time as she returns to work, or until further Order of the Commission. The amounts that have accrued shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. Defendant-carrier PMA shall pay for all related medical expense incurred or to be incurred by plaintiff as the result of her December 9, 2003, injury by accident, related symptoms, and her related workplace fall of June 7, 2004, including expenses associated with treatment provided by Dr. Lilly, Dr. Goebel, and Dr. Hermanny subsequent to June 7, 2004.
3. A reasonable attorney's fee of 25% of the compensation awarded herein is approved for counsel for plaintiff. Defendant-carrier PMA shall pay directly to plaintiff's counsel 25% of the lump sum accrued and shall thereafter pay directly to such counsel every fourth check.
4. Defendant-carrier PMA shall pay the costs.
This 25th day of July 2006.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER